IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Julian Harman,             )
                              )
                Plaintiff,    )
                              )
          vs.              )
                              )
Carolyn W. Colvin, Acting  )
Commissioner of Social Security,[1]  )
                              )
            Defendant.  )
_____)

Civil Action No. 6:13-1728-TMC-KFM

**REPORT OF MAGISTRATE JUDGE**

       This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

       The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

       The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on July 24, 2008, alleging that he became unable to work on October 1, 2004. The applications were denied initially and on reconsideration by the Social Security Administration. On December 10, 2010, the plaintiff

---

    [1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

    [2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff and

Joel D. Leonard, an impartial vocational expert, appeared on February 15, 2012,

considered the case *de novo*, and on May 9, 2012, found that the plaintiff was not under

a disability as defined in the Social Security Act, as amended.  The ALJ's finding became

the final decision of the Commissioner of Social Security when the Appeals Council denied

the plaintiff's request for review on April 24, 2013.  The plaintiff then filed this action for

judicial review.

In making the determination that the plaintiff is not entitled to benefits, the

Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of
the Social Security Act through December 31, 2008.

(2)    The claimant has not engaged in substantial gainful
activity since October 1, 2004 (20 C.F.R §§ 404.1571 *et seq.*,
and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments:
Major depressive disorder, posttraumatic stress disorder
("PTSD"), panic disorder without agoraphobia, social phobia,
substance abuse disorder, status post fusion C3-C5, status
post decompressive lumbar laminectomy L3-S1, neck pain, low
back pain, and a history of seizures and right ulnar neuropathy
(20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or
combination of impairments that meets or medically equals the
severity of one of the listed impairments in 20 C.F.R. Part 404,
Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525,
404.1526, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that
the claimant has the residual functional capacity to perform light
work (lift, carry, push and pull 20 pounds occasionally and 10
pounds frequently) as defined in 20 C.F.R. §§ 404.1567(b) and
416.967(b) in that the claimant is able to stand and/or walk at
least 6 hours in an 8-hour workday; sit about 6 hours in an 8-
hour workday; and pushing and/or pulling unlimited other than
as stated for lifting and carrying.  The claimant is limited to
never climbing ladders, ropes, or scaffolds and never crawling;
is limited to occasionally climbing ramps and stairs, balancing,

2

stooping, kneeling, and crouching; is limited to frequent reaching, fingering, and handling with the non-dominant hand, with unlimited assistive use of the dominant hand (the claimant is left hand dominant). The claimant must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. The claimant is capable of only work involving simple instructions and occasional contact with the public.

(6)    The claimant is unable to perform past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on November 28, 1957, and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability date. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination disability because applying the Medical Vocational Rules directly supports a finding of "not disabled" whether or not the claimant has transferable job skills to other occupations (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2)

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2004, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

**APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

4

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### *Physical Health Evidence*

On November 24, 2004, the plaintiff saw Philip Rhine, M.D., at Sandhills Family Medicine for left shoulder pain that went down his arm.  He had headaches, and his right leg hurt too.  He had symptoms of radiculopathy with severe neck pain that radiated pain and numbness into his left arm.  He had a history of severe depression.  He had a decreased range of motion of his neck with cervical radiculopathy (Tr. 585).

In January 2005, the plaintiff visited consultative examiner Mitchell Hegquist, M.D. (Tr. 539-45).  The plaintiff alleged that he had intermittent coldness, numbness, pins and needles, and pain in his dominant shoulder (*i.e.*, his left shoulder) that radiated down into the fourth and fifth fingers of his left hand (Tr. 539-40).  The plaintiff stated that he was not experiencing any numbness at the time of the evaluation (Tr. 542).  Dr. Hegquist examined the plaintiff and reported that muscle examination revealed no atrophy; that his grip strength was normal; that he was able to perform fine manipulation (*i.e.*, fingering); that he was able to perform gross manipulation (*i.e.*, handling); that his range of motion was normal; that the plaintiff was in no acute distress; and that, notwithstanding his complaints, there were no obvious motor or sensory deficits (Tr. 541-44).  Dr. Hegquist also performed a mental status examination and reported that the plaintiff was alert and oriented; that his memory was grossly intact; and that his thought processes, behavior, and intelligence were all within normal limits (Tr. 542).

On January 21, 2005, the plaintiff reported to Dr. Rhine that Vocational Rehab told him that he probably needed surgery on his neck. He had cervical spondylosis with intermittent radiculopathy. He also had chronic low back pain. Dr. Rhine noted that the plaintiff was functioning a little better and was no longer taking Valium.  An MRI was recommended (Tr. 583).On February 18, 2005, Dr. Rhine opined:

6

> Whereas [the plaintiff] may be disabled from doing the heavy physical work, which he did as a biomedical technician, he certainly is not medically disabled from most other occupations. He is encouraged to seek a different type of work since I really do not think that he is going to be successful in obtaining disability [from the Agency], which is appropriate.

(Tr. 582).  Dr. Rhine also wrote that a MRI showed multilevel degenerative disease.  The plaintiff had chronic neck and back pain (Tr. 582).

On April 11, 2005, Dr. Rhine prescribed Xanax and Lortab for chronic neck pain secondary to cervical spondylosis (Tr. 580).  On September 14, 2005, Dr. Rhine reported that the Veterans Administration ("VA") had changed many of the plaintiff's medications (Tr. 577).

On May 24, 2005, the plaintiff was diagnosed with lumbar degenerative joint disease with radiculopathy at the VA Medical Center ("VAMC") in Columbia.  He was unable to walk more than a few yards without pain (Tr. 790).

On August 8, 2005, the plaintiff was seen at the VAMC for cervical and lumbar radiculopathy, hyperlipidemia, irritable bowel syndrome and depression.  He had chronic pain in his legs and arms.  An MRI of the c-spine showed spondylosis (Tr. 783, 785).

On December 29, 2005, the plaintiff visited Eduardo Irizarry, M.D., at the VAMC complaining of pain.  The plaintiff had cervical pain that radiated to his left shoulder and left fourth and fifth fingers.  That condition was getting worse.  He also had lower back pain that radiated to both feet (Tr. 771).  Dr. Irizarry examined the plaintiff and reported that the examination and the plaintiff's complaints "do not correlate" (Tr. 772).

On February 14, 2006, Dr. Rhine refilled the plaintiff's Lortab and Percocet and diagnosed him with an umbilical hernia (Tr. 575).  On March 1, 2006, the plaintiff had abdominal and back pain and was seen in the emergency department at the VAMC (Tr. 751).  On May 12, 2006, he had an umbilical hernia removed (Tr. 731).

7

On July 3, 2006, the plaintiff was seen by Dr. Rhine for hypertension, cervical spondylosis, chronic lumbar back pain, anxiety, and depression (Tr. 573-74).

On August 10, 2006, Catherine Sarbah, M.D., M.P.H., examined the plaintiff, reported that he was in "no acute distress" and "strongly encouraged" him to find a job (Tr. 718, 720, 722). Cervical spine x-rays showed reversal of the cervical lordosis, mild scoliosis and mild disc space narrowing and spurring at C4-5 and C5-6 (Tr. 599). A few days later, the plaintiff was seen by a social worker at the VAMC and agreed to go to the unemployment office to apply for jobs (Tr. 714).

In October 2006, the plaintiff visited Deena Flessas, M.D., at the VAMC (Tr. 709). Dr. Flessas noted that the plaintiff complained of significant pain, but encouraged him to look for a job (Tr. 707, 709).

On November 10, 2006, the plaintiff was seen by Dr. Rhine for hypertension, cervical spondylosis, chronic lumbar back pain, anxiety, and depression (Tr. 573-74).

On August 17, 2007, Dr. Rhine noted that the plaintiff remained out of work due to depression and chronic back pain and that he was working with the VA to gain employment of some sort (Tr. 952).

On June 23, 2008, the plaintiff had right hand muscle wasting with numbness of two fingers in ulnar distribution and neck pain (Tr. 855). An MRI of his neck from June 30, 2008, showed central canal and intervertebral nerve root canal stenosis at multiple levels of the cervical spine, most severe at C4-5 and C5-6 (Tr. 827-28). A nerve conduction and EMG report showed severe right ulnar neuropathy and moderate right carpal tunnel syndrome (Tr. 913).

On August 27, 2008, Dr. Rhine saw the plaintiff for chronic cervical and lumbar pain and reported that the plaintiff had recently begun to suffer numbness and muscle atrophy in his nondominant hand (*i.e.*, his right hand) (Tr. 951).

On January 8, 2009, the plaintiff presented for a medical clearance exam in anticipation of neurosurgery.  He had delayed his surgery because he was trying to get his service-connected rating sorted out because he could not afford to pay for surgery.  He was advised that he was at high risk of not recovering function in his right upper extremity, if it was not too late already.  He felt that his left hand was also affected (Tr. 933).

On February 2, 2009, an MRI of the plaintiff's lumbar spine showed degenerative stenosis at the L3-L4 through the L5-S1 levels, which involved the intervertebral nerve canals bilaterally (Tr. 924).  On February 27, 2009, Dr. Rhine reported that the plaintiff had "muscle wasting" in his nondominant hand (Tr. 951).

On March 10, 2009, the plaintiff visited William Warmath, M.D. (Tr. 954).  Dr. Warmath examined the plaintiff and reported that he had "atrophy and claw hand deformity" in his nondominant hand but that he did not have proximal upper extremity weakness or atrophy (*id.*).  Dr. Warmath further reported that he was "not sure" if decompression of the plaintiff's carpal tunnel syndrome would be of any benefit (*id.*).

In May 2009, Dr. Hegquist examined the plaintiff and reported that he had a 30 degree flexion contracture at the middle joint of the fourth and fifth fingers of his nondominant hand but that he had full flexion in those fingers (*i.e.*, he could make a fist) and that those fingers had normal passive extension (*i.e.*, they could open fully).  Dr. Hegquist further reported that the plaintiff had good range of motion and strength in his extremity joints; that muscle examination revealed no atrophy; that the plaintiff's grip strength was normal; that the plaintiff was able to perform fine manipulation (*i.e.*, fingering); that the plaintiff was able to perform gross manipulation (*i.e.,* handling); that the plaintiff was in no acute distress; and that he did not have any other obvious motor or sensory deficits.  Dr. Hegquist also performed a mental status examination and reported that the plaintiff was alert and oriented; that his memory was grossly intact; although his affect was "somewhat

flat"; that his thought processes and behavior were within normal limits; and that his intelligence was within normal limits (Tr. 964-67).

On June 10, 2009, state agency physician Seham El-Ibiary, M.D., reviewed the evidence of record and opined that the plaintiff was limited to "frequent" (as opposed to "constant")[3] handling and fingering with his nondominant hand (Tr. 971). Dr. El-Ibiary opined that the plaintiff could occasionally lift and/or carry 20 pounds, frequently lift/and or carry ten pounds, and stand, walk, and sit for about six hours. He could frequently climb stairs and ramps, but never climb ladders, ropes, and scaffolds. He could occasionally balance, stoop, kneel, crouch, and crawl. Dr. El-Ibiary further opined that the plaintiff did not have any manipulative limitations with his dominant hand (*i.e.*, his left hand) and that he had an unlimited ability to reach in all directions (including overhead) (*id*.). Dr. El-Ibiary also opined that the plaintiff was limited to "frequent" (again, as opposed to "constant") pushing and pulling of hand controls with his right upper extremity (Tr. 970).

On June 29, 2009, a cervical discectomy with allograft placement at C3-4 and C4-5 was performed (Tr. 1330-34).

In August 2009, Dr. Rhine wrote that the plaintiff had surgery on his cervical spine. Dr. Rhine examined the plaintiff and reported that the contractures in his nondominant hand were resolving, but that he needed Soma for chronic pain (Tr. 1064).

On October 12, 2009, in a letter to the VA, Dr. Rhine wrote that he had treated the plaintiff since 1986 and that in 1991 the plaintiff had been involved in an automobile accident while on active duty. The accident resulted in neck and back injuries and increasing pain, which required treatment on and off for years. Dr. Rhine opined that the plaintiff's impairments limited his ability to perform certain basic work activities: "[The plaintiff's] chronic neck and low back pain have significantly affected his ability to be

---

[3] "Frequent" means the activity exists from 1/3 to 2/3 of the time; "constant" means the activity exists 2/3 or more of the time. *See DOT*, App. C (4th ed. 1991), *available at* 1991 WL 688702,

gainfully employed.  Demands of his job as a biomedical technician have been significantly affected . . . " (Tr. 994).

On October 13, 2009, cervical spine x-rays showed the fusion from the June discectomy and degenerative disc space narrowing at C5-6 and C6-7 (Tr. 1362).

On March 6, 2010, an MRI of the plaintiff's lumbar spine showed multilevel spondylosis with impingement of bilateral nerves (Tr. 1005, 1361).

On April 9, 2010, the plaintiff was diagnosed with bilateral femoral head avascular necrosis, which may have been chronic at that point in time (Tr. 1000-1004).  A bilateral hip CT showed sclerosis at each femoral head, which likely represented remote avascular necrosis (Tr. 997).  On April 14, 2010, Jennifer Netzley, R.N., examined the plaintiff at the VAMC and reported that he had no muscular strength deficits and that his range of motion was normal (Tr. 1125).

In July 2010, Rachel Pertile examined the plaintiff at the VAMC and reported that his motor strength was intact (Tr. 1086).

In September 2010, Demerise Minor, N.P., and John Brown, M.D., reported, following an examination, that the plaintiff's grip strength in both hands was 5/5 and that his fine motor skills in both hands (*i.e.*, fingering) were 5/5 (Tr. 1092-93).  Ms. Minor and Dr. Brown also reported that the plaintiff had no clubbing or deformities in his extremities (*id*.).

On October 4, 2010, a lumbar laminectomy surgery was performed at the Charleston VAMC.  The plaintiff was noted to have 40% disability rating for degenerative arthritis of the spine and paralysis of the sciatic nerve (Tr. 1207, 1211, 1335-38).  On October 6, 2010, Libby Kosnik, M.D., examined the plaintiff and reported that his strength was 5/5 (Tr. 1237, 1255).  On October 21, 2010, the plaintiff reported weakness in his legs and falling since his back surgery (Tr. 1319, 1393).  On November 3, 2010, physical therapy was prescribed (Tr. 1475).

On November 23, 2010, state agency physician Darla Mullaney, M.D., opined that the plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, and stand, walk, and sit about six hours in an eight-hour day. He was unlimited in pushing and pulling. The plaintiff could occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds and never crawl. He could occasionally balance, stoop, kneel, and crouch. He was limited to occasional reaching, handling, and fingering on the right. He should avoid concentrated exposure to hazards (Tr. 1323-29).

On December 7, 2010, Dr. Rhine wrote that the plaintiff had extensive decompression of L3-S1. He still experienced back pain (Tr. 1477).

On June 14, 2011, the plaintiff stated that he was continuing to be seen at the VA, he was starting physical therapy, and he was seeing a psychiatrist. The plaintiff had muscle wasting of his right hand as he had experienced before (Tr. 1477). Manisha Patel, M.D., examined the plaintiff at the VAMC on June 28, 2011, and reported that his upper extremity strength was intact bilaterally (Tr. 1413). The plaintiff continued to have neck and back pain. He had stiffness and muscle spasms that affected his mobility and limited cervical and lumbar range of motion. Dr. Patel also reported that the plaintiff's sensation was grossly intact (Tr. 1412-13).

### Mental Health Evidence

The plaintiff was admitted to the Earle E. Morris, Jr. Alcohol and Drug Addiction Treatment Center in Columbia on March 18, 2004, and was discharged on April 14, 2004. He had been using prescription pain reliever. He felt depressed and reported not being able to work due to back pain. His presentation appeared consistent with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. The plaintiff was

diagnosed with opiate dependence, depression, hypertension, hyperlipidemia, chronic neck and back pain.  His Global Assessment of Functioning ("GAF")[4] was 60 (Tr. 449-58).

On January 14, 2005, the plaintiff visited consultative examiner Robespierre Del Rio, M.D., for a psychiatric mental status examination (Tr. 534-38).  Dr. Del Rio examined the plaintiff and reported that he was able to maintain adequate eye contact; he was alert, attentive, cooperative, responsive, and oriented; his insight and judgment were fair to good; his intellectual functioning was within the normal range; his memory was intact for recent, immediate, and remote events; and he was able to recall three out of three objects tested within a one-minute and two-minute time interval (Tr. 535-36).  Dr. Del Rio stated that the plaintiff's history and previous psychiatric and medical intervention would suggest a diagnosis of major depressive disorder, radiculopathy, hypertension, hypercholesterolemia, and pain disorder.   Ongoing supportive psychotherapy was recommended to maximize the plaintiff's coping resources and improve his overall level of functioning.  Dr. Del Rio further reported that the plaintiff appeared to be capable of interacting and communicating with others and that there was no clear evidence of impaired social functioning (Tr. 537-38).

On February 1, 2005, state agency psychologist Manhal Wieland, Ph.D., reviewed the evidence of record and opined that the plaintiff was able to perform simple tasks.  Dr. Wieland further opined that, although the plaintiff "may" find work with the general public "stressful," he was able to relate appropriately to supervisors and co-workers (Tr. 546, 547, 548). Dr. Wieland found the plaintiff to be moderately restricted in activities of daily living with moderate difficulties in maintaining social functioning and concentration,

---

[4]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." See Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

persistence, or pace due to his depression, pain disorder, anxiety, antisocial traits and opiate dependence (Tr. 546-62).

On December 29, 2005, the plaintiff was seen at the VAMC for chronic tension and easy irritability (Tr. 767). On January 31, 2006, he had increased irritability and frustration, difficulty focusing, and cyclic mood swings. His GAF was 60 (Tr. 757-60). The plaintiff stated he had experienced problems with depression and anxiety since 2002 (Tr. 749-50).

On June 9, 2006, the plaintiff's Effexor dosage was increased. On June 21, 2006, the plaintiff reported improved motivation but increased irritability (Tr. 727). On August 10 and 15, 2006, the plaintiff was seen for depression and anxiety (Tr. 714, 722).

On October 17, 2006, the plaintiff's mood was disconnected, his affect was constricted, and his thought process was tangential (Tr. 709). On October 24, 2006, the plaintiff called the VAMC and stated that he was having an anxiety attack with shortness of breath and chest tightness (Tr. 703).

On January 4, 2007, the plaintiff was admitted to the VAMC for depression and decreased energy. His girlfriend suggested that he seek help. His MMPI-2 scores suggested a mixed diagnostic picture including mild to moderate depression, anxiety, and an elevation on the schizophrenia scale. The elevation was most likely to be associated with a schizoid or borderline personality disorder. The plaintiff showed a tendency to focus on somatic complaints. He was discharged on January 10, 2007 (Tr. 627, 1081-85). In a followup appointment on February 2, 2007, the plaintiff was diagnosed with substance induced mood disorder, pain disorder associated with psychological factors, and neck and back pain. His GAF was 60 (Tr. 622).

On two separate occasions in January 2007, Elizabeth Sikes, M.D., conducted mental status examinations of the plaintiff at the VAMC. The first time, Dr. Sikes reported that the plaintiff was alert, attentive, cooperative, and oriented; his judgment was good; his

14

concentration was adequate; and his memory and cognition appeared to be intact (Tr. 652-53). The second time, Dr. Sikes reported that the plaintiff was alert and oriented and that his attention, concentration, and memory were all intact (Tr. 1083). During the same month, Ray Jones, R.N., also conducted a mental status examination and reported that the plaintiff was alert, attentive, cooperative, and oriented; his judgment was fair; his concentration was adequate; and his memory and cognition appeared to be intact (Tr. 665-66).

On April 16, 2007, the plaintiff called the VAMC and stated that he was not able to function and his moods changed quickly. On April 17, 2007, the plaintiff called again and reported that he did not feel safe. He stated he had a seizure the night before. He "blacked out," but his girlfriend was able to wake him up (Tr. 616).

On July 12, 2007, the plaintiff was seen at the VAMC for anxiety, somatoform disorder, and polysubstance abuse. His Celexa was helping more than the Effexor, but he still had bad days with pain and anxiety (Tr. 898, 906). In April 2008, the plaintiff was seen three times for anxiety and depression (Tr. 864, 867, 872). On February 12, 2009, the plaintiff stated that he had been feeling more depressed and his energy level was down (Tr. 962).

On June 10, 2009, state agency psychologist Larry Clanton, Ph.D., reviewed the evidence of record. He determined that the plaintiff had mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, or pace due to his mood disorder, anxiety, pain disorder with psychological factors, somatoform, and polysubstance abuse. Dr. Clanton opined that the plaintiff was limited to work involving simple instructions; that he did not have any limitations in his ability to interact with peers, co-workers, and supervisors; and that the plaintiff would "perform best" in situations that did not require "on-going interactions with the public" (Tr. 976-93)

On September 23, 2010, the plaintiff visited consultative examiner Vernell Fogle, Ph.D., for a mental status examination (Tr. 1167-72). Dr. Fogle determined that the

15

plaintiff suffered from moderate and chronic major depression, panic disorder without agoraphobia, PTSD, social phobia, chronic pain, and social isolation.  He had a GAF of 58. Dr. Fogle reported that the plaintiff was alert, responsive, and oriented; he was able to immediately register three of three items and recalled one of three items after five and a half minutes; he could spell "glass" and "world" backwards; he accurately recited the months of the year backwards; he was able to perform mental arithmetic and correctly added, subtracted, and multiplied two single digit numbers; he was able to accurately compute the change he should receive after a financial transaction; his judgment was good; he was able to follow a three-step verbal command without error; he was able to follow commands in written instructions; and his estimated intelligence fell within the above-average to average range.  Dr. Fogle opined that the plaintiff would be able to understand, remember, and carry out short, simple instructions; he would have moderate difficulty being able to engage appropriately with others on a job; he had moderate limitation in responding to increasing work pressures; and he had moderate limitation in remembering and adjusting to changes in the work environment (Tr. 1167-71).

A few days later, state agency psychologist Edward Waller, Ph.D., reviewed the evidence of record, including Dr. Fogle's report (Tr. 1185), and opined that the plaintiff could perform simple work tasks.  Dr. Waller further opined that, although the plaintiff "would perform better" in a job setting that did not require "ongoing interaction with the public," he was not significantly limited in his ability to work with co-workers or peers (Tr. 1173-89).

The plaintiff returned to the Columbia VAMC in December 2010 with depression.  He was diagnosed with malingering, adjustment disorder with disturbance of mood and conduct, and pain disorder.  His GAF was 40[5] (Tr. 1365-68)

On June 7 and 28, 2011, the plaintiff was seen for chronic depressive disorder and chronic pain syndrome (Tr. 1412, 1415, 1421).

### *Activities of Daily Living*

The plaintiff stated that he was able to go to school; complete school assignments; do work study; participate in vocational rehabilitation; handle his finances; live alone; drive; take care of himself independently, including by maintaining his personal hygiene; do household chores such as cleaning, cooking, and laundry; use public transportation; shop for and unload groceries; study the Bible; watch television; use a computer; and interact with others at school, on the telephone, and online (Tr. 61, 337, 339, 340, 341, 537, 773-77, 864, 866-67, 951, 1169, 1427).

### *Hearing Testimony*

The plaintiff testified that he became disabled on October 1, 2004.  He lived with his cousin in a two-level house.  He was 5'10" and weighed 200 pounds.  He was divorced and received 40% VA disability benefits.  He had a driver's license, but no car.  He took a taxi to the hearing.  The plaintiff testified that he finished a two-year degree in criminal justice and all but three courses on another two-year degree.  He was in the Marine Corps in 1979 and 1980 and was activated with the Army National Guard in 1991 (Tr. 59).

The plaintiff reported that he did not smoke or drink.  He took prescribed medications as directed.  He had episodes when the required dosage was not adequate, and he would take more medications than what was prescribed (Tr. 62).

---

[5]A GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See DSM-IV*, 32-34 (Text Revision 4th ed. 2000).

The plaintiff testified that he awoke around 10:00 am and spent time mingling with others at the homeless shelter where he resided.  He stated that he used his cousin's house address because he did not want mail to get lost at the homeless shelter. He did not wake until 10:00 am because of medications that sedated him.  He stayed at the homeless shelter all day.  He ate lunch at 12:00 and dinner at 7:00.  He did not have many friends so he did not do much during the day (Tr. 67-69).

The plaintiff testified that he could not stand in one spot longer than a few minutes before he would need to move around.  He did not go to grocery stores where he might need to stand in line, and he usually tried to find someone to go to the grocery store with him so that he could go to the car while the other person waited in line. He could lift a gallon of milk, but not high. The plaintiff testified that he last had a car in 2002, and the last time he drove was three months prior to the hearing.  He was not able to turn his head far enough to the right or left to see his blind spot (Tr. 69-74).

The plaintiff testified that he took half a Lortab, and if that did not ease his pain, he would take a whole Lortab.  He would take a diazepam or Valium if he was experiencing PTSD or muscle spasms.  He tried to not take Soma.  He took Elavil every night and Celexa for depression.  He took Lipid for high triglycerides and Zocor for cholesterol.  He took Albuterol.  The plaintiff reported that there were days when he took Lortab, Valium, Soma, and Percocet in one day.  The ALJ asked about medical records that advised him to reduce medications and go to physical therapy.  The plaintiff stated that he was taking less Lortab, but he was taking more Percocet.  His sleep was interrupted by pain, and he would take an analgesic in addition to the Elavil to help him sleep (Tr. 75-79).

The plaintiff took Elavil and Celexa for depression.  His depression made him want to sit in a corner and isolate himself.  He did not want to kill himself, but he did not want to live anymore.  His appetite was affected by his depression.  He did not mind being in groups of people for a little while, but he needed to be able to leave if he felt closed in.

18

He had seizures on a few occasions when he went into Wal-Mart.  He did not belong to any social clubs or have any hobbies (Tr. 79-81).

Vocational expert Joel D. Leonard testified at the administrative hearing in response to a series of hypotheticals posed by the ALJ (Tr. 81-89).  In addition, subsequent to the hearing, the ALJ submitted interrogatories to Mr. Leonard in which he posed a hypothetical question concerning a person with the plaintiff's background and residual functional capacity ("RFC") as found by the ALJ in her decision (Tr. 392-95).  In response (Tr. 389-91), Mr. Leonard identified the occupations of production inspector and production machine tender (Tr. 390).

## ANALYSIS

The plaintiff was 46 years old on his alleged disability onset date and 54 years old on the date of the ALJ's decision.  He completed a degree in criminal justice and nearly completed a degree in medical equipment repair.  He has earned approximately four years worth of college credit (Tr. 536).  The plaintiff has past work history as a biomedical technician.  The plaintiff argues that the ALJ erred by (1) failing to properly evaluate his RFC, (2) failing to properly explain the weight assigned to opinion evidence, and (3) failing to properly evaluate his mental impairments.

The plaintiff first argues that the ALJ failed to properly evaluate his manipulative restrictions in the RFC finding (pl. brief at pp. 22-27).  The ALJ found that the plaintiff had the RFC to perform a range of light work with the following limitations: never climbing ladders, ropes, or scaffolds; never crawling; occasionally climbing ramps and stairs, balancing, stooping, kneeling and crouching;  frequently (as opposed to constantly) reaching, fingering, and handling with his nondominant hand (i.e., his right hand), with unlimited assistive use of his dominant hand (i.e., his left hand); avoiding concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other respiratory irritants; and

19

limited to work involving only simple instructions and only occasional contact with the public (Tr. 19-20).

> Social Security Ruling ("SSR") 96-8p provides in pertinent part:
>
> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Moreover, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

The ALJ gave "very significant weight" to Dr. El-Ibiary's opinion that the plaintiff was limited to "frequent" (as opposed to "constant") handling and fingering with his nondominant right hand and that the plaintiff did not have any manipulative limitations with his dominant left hand (Tr. 19-20, 31; *see* Tr. 971). Although Dr. El-Ibiary opined that the

plaintiff had an unlimited ability to reach in all directions (including overhead) (Tr. 971), the ALJ gave the plaintiff the benefit of the doubt by finding that he could do so only "frequently" (again, as opposed to "constantly") (Tr. 20).

Dr. El-Ibiary is a state agency physician whose opinion must be considered by the ALJ as that of a highly-qualified physician who is an expert in the evaluation of the medical issues in disability claims under the Social Security Act. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); *Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986) (stating that a non-examining physician's opinion can be relied upon when it is consistent with the record and that, "if the medical expert testimony from examining or treating physicians goes both ways, a determination coming down on the side of the non-examining, non-treating physician should stand").

As the ALJ correctly noted (Tr. 31), Dr. El- Ibiary's opinion is consistent with the medical evidence of record. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).  First, as the ALJ correctly emphasized, Dr. El-Ibiary's opinion is consistent with the objective medical findings of 5/5 strength (Tr. 31; *see* Tr. 18, 21, 24, 25).   Multiple medical providers examined the plaintiff and reported that he had 5/5 strength in his hands and/or his upper extremities (*see, e.g.*, Tr. 1093, 1237, 1255, 1367, 1443; *see also, e.g.*, Tr. 966, 1086, 1125, 1413).  Also as the ALJ correctly emphasized, Dr. El-Ibiary's opinion is consistent with the objective medical findings concerning the plaintiff's manipulative and grip functioning (Tr. 31; *see* Tr. 18, 21, 23, 24). Multiple medical providers examined the plaintiff reported that his grip strength was normal (*see, e.g.*, Tr. 542, 966, 1093) and that he was able to perform fine manipulations (i.e., fingering) and gross manipulations (i.e., handling) (*see, e.g.*, Tr. 542, 966, 1093).  In addition, Dr. El-Ibiary's opinion is consistent with other

21

evidence that the ALJ emphasized in his RFC finding, including that multiple medical providers, including the plaintiff's treating physician, encouraged him to look for a job (Tr. 21, 26, 27 (citing Tr. 582, 709, 722); *see* Tr. 714, 743, 776).  The Commissioner notes that Dr. El-Ibiary provided an opinion after specifically citing evidence concerning pain, numbness, and weakness in the plaintiff's nondominant right hand (Tr. 969).   The Commissioner further notes that the ALJ explicitly and repeatedly addressed the evidence concerning the plaintiff's pain, numbness, and weakness (Tr.17, 20, 21, 22, 23, 24, 25, 27, 28, 29, 30, 32).

The plaintiff argues that the court must "view[] with caution" the ALJ's statement that Dr. El-Ibiary's opinion is consistent with the objective medical findings (pl. brief at p. 27 n.1).  In support of this assertion, the plaintiff states that the ALJ incorrectly cited page 26 of Exhibit 31F "as demonstrating that [the plaintiff] had 5/5 strength and could perform normal fine manipulation on exam" (*id*. (citing Tr. 18, 1090)).  The plaintiff contends that the cited document does not contain either of these findings (*id*.).  The citation at issue occurred in the ALJ's listing analysis at step three of the sequential evaluation process (Tr. 18) wherein the ALJ stated:

> The evidence does not establish the requisite level of motor function disorganization as described in [Listing] 11.04B, in spite of prescribed treatment for peripheral neuropathy under [Listing] 11.14.  The claimant did get some muscle wasting of the right had that improved after cervical surgery.  However, the claimant shows normal grip strength and fine manipulation on examination. (Ex. 31F/26).

(Tr. 18).  As noted by the Commissioner, the citation contains a typographical error, as page 29, rather than page 26, of Exhibit 31F explicitly indicates that the plaintiff's grip strength in both hands was 5/5 and that his fine motor skills in both hands were 5/5 (Tr. 1093).  Pages 26 and 29 of Exhibit 31F are part of the same report generated on the same date

concerning the same visit (Tr. 1090, 1093).  Accordingly, this allegation of error is without merit.

The plaintiff next argues that the ALJ's determination that Dr. El-Ibiary's opinion is consistent with the objective medical findings "is in itself inconsistent with [Dr. El-Ibiary's] opinion, which indicated weakness in the right hand and changes to the 4th and 5th fingers" (pl. brief at pp. 27-28 (citing Tr. 969)).  Dr. El-Ibiary specifically considered this evidence (Tr. 969) and opined that the plaintiff was limited to frequent handling and fingering with his nondominant hand (i.e., his right hand) (Tr. 971).  The ALJ gave "very significant weight" to this opinion and included the limitation in the RFC finding (Tr. 20), and the plaintiff has failed to show that the that the facts he emphasizes, and which Dr. El-Ibiary explicitly cited, prove that he had any limitations beyond those that the ALJ included in the RFC finding.

The plaintiff argues that the ALJ's statement in her RFC finding that the plaintiff had "unlimited assistive use" of his dominant hand (i.e., his left hand) meant that the plaintiff "would not be expected to perform any gross or fine manipulation with that upper extremity" (pl. brief at p. 25).  The plaintiff further contends that "any assumption the ALJ meant no restriction is highly speculative" (Tr. 26).  The undersigned disagrees. The Commissioner states that she is aware of only one case in which any court within the Fourth Circuit has  considered the term "assistive use." In that case, the ALJ limited the claimant to "no use whatsoever even no assistive use of the non-dominant left upper extremity." *McFarlin v. Colvin*, No. 4:12-cv-01233-DCN, 2013 WL 4505420, at *6 (D.S.C. Aug. 22, 2013).  That is not the case here. As conceded by the Commissioner, the ALJ certainly could have expressed herself more clearly.  However, the decision is clear that the ALJ limited the plaintiff to frequent reaching, fingering, and handling with his nondominant hand (i.e., his right hand) and that he had an unlimited ability to use his dominant hand (i.e., his left hand) to assist with those manipulative activities.  This meaning is evident from the fact

23

that the ALJ assigned "very significant weight" to Dr. El-Ibiary's opinion that the plaintiff did not have any limitations on his ability to use his dominant hand (i.e., his left hand) (Tr. 31 (*see* Tr. 971)). The ALJ also gave "significant weight" to the opinion of Dr. Mullaney, who also opined that the plaintiff did not have any manipulative limitations with his left hand (Tr. 31 (*see* Tr. 1325)). Moreover, the abundant evidence relied upon by the ALJ and cited above supports a finding that the plaintiff did not have any limitations on his ability to use his left hand (Tr. 21-25). Accordingly, this allegation of error is without merit.

The plaintiff next argues that the hypothetical posed to the vocational expert via interrogatories following the hearing "proposed no restrictions on the use of [his] upper extremities" (pl. brief at p. 30; *see also id.* at p. 26 ("[i]t was only when the ALJ used a hypothetical question that completely removed all manipulative restrictions to both upper extremities" that the vocational expert identified jobs that a person such as the plaintiff could perform)). This statement is simply inaccurate. The hypothetical explicitly described a person who – like the plaintiff as the ALJ found in the RFC assessment – was limited to "[f]requent reaching, fingering and handling with the non-dominant hand" (i.e., the plaintiff's right hand) (Tr. 393). Accordingly, this allegation of error is without merit.

As argued by the Commissioner, Dr. El-Ibiary opined that the plaintiff could frequently use his nondominant hand (i.e., his right hand) for reaching and fingering (Tr. 971), and Dr. Mullaney opined that the plaintiff could do so only occasionally (Tr. 1325). The ALJ stated that Dr. Mullaney's "limitation for 'occasional' manipulative use of the right upper extremity is not consistent with the reasoning of the decision or the medical evidence of record, which shows normal manipulative functioning" (Tr. 31). Thus, the ALJ chose to give Dr. El-Ibiary's opinion greater weight on this point.

Dr. El-Ibiary also opined that the plaintiff was limited to frequent pushing and pulling of hand controls with his right upper extremity (Tr. 969-70), while Dr. Mullaney opined that the plaintiff had an unlimited ability to push and pull hand controls (Tr. 1323).

24

The ALJ stated in her RFC finding that "pushing and/or pulling [is] unlimited other than as stated for lifting and carrying" (Tr. 19). The limitations on lifting and carrying referenced by the ALJ were "lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently" (Tr. 29). While the ALJ did not explicitly discuss her reasoning for adopting Dr. Mullaney's opinion on this point rather than Dr. El-Ibiary's, she did state that she gave Dr. Mullaney's opinion "significant weight," and the evidence discussed above showing normal manipulative functioning supports this finding. The plaintiff has not established that he suffered any limitations beyond those that the ALJ included in the RFC finding. Moreover, even if the ALJ had erred, the plaintiff cannot establish that he suffered any prejudice, because the RFC limitation to frequent reaching, handling, and fingering with the right hand (Tr. 20) effectively precludes work requiring more than frequent use of the right upper extremity for pushing and pulling hand controls. *See, e.g., Bowling v.* Astrue, No. Civ-11-283-FHS-SPS, 2012 WL 4433712, at *3 (E.D. Okla. Sept. 7, 2012) (finding that jobs identified by vocational expert that all required frequent reaching and handling conflicted with RFC finding that claimant was limited to never pushing/pulling hand controls); *Herbert v. Barnhart*, No. Civ. A. 00-2417-DJW, 2002 WL 31180762 at *8–9 (D. Kan. Sept. 19, 2002) (finding that identified jobs of cashier and ticket seller required frequent reaching, handling, and fingering, which appeared to be in conflict with the claimant's RFC restrictions from rapid, repetitive use of hand controls).

The plaintiff further argues that the ALJ should have given more weight in general to Dr. Mullaney's opinion than to Dr. El-Ibiary's opinion because Dr. El-Ibiary's opinion "was provided before the medical treatment records began referring to [the plaintiff] as having developed a clawing deformity in the digits of his right hand" (pl. brief at p. 30). However, as noted by the Commissioner, Dr. El-Ibiary's June 2009 opinion was provided three months after Dr. Warmath reported that the plaintiff had a "claw hand deformity" in his nondominant right hand (Tr. 954). The Commissioner notes that "claw hand deformity"

25

is simply another way of describing the 30 degree flexion contracture at the middle joints of the fourth and fifth fingers of the plaintiff's right hand (Tr. 966), as described by Dr. Hegquist in May 2009.  Dr. Hegquist found that the plaintiff had full flexion in those fingers (i.e., he could make a fist), those fingers had normal passive extension (i.e., Dr. Hegquist could open them fully), the plaintiff's grip strength was normal, the plaintiff was able to perform fine manipulation (i.e., fingering), and the plaintiff was able to perform gross manipulation (i.e., handling) (Tr. 966).  Moreover, Dr. El-Ibiary specifically noted "some changes [to the plaintiff's] 4th and 5th fingers" as support for the RFC assessment (Tr. 969).  Accordingly, Dr. El-Ibiary clearly considered the plaintiff's "claw hand deformity," and this allegation of error is without merit.

The plaintiff next argues that the ALJ improperly "projected the first opinion [of treating physician Dr. Rhine] onto the second opinion [of Dr. Rhine]" (pl. brief at p. 31). In February 2005 – i.e., four months after the plaintiff's alleged onset date – Dr. Rhine opined that, although the plaintiff "may" no longer be able to do "the heavy physical work" he once did as a biomedical technician, "he certainly is not medically disabled from most other occupations" (Tr. 582). In October 2009, Dr. Rhine opined as follows: "[The plaintiff's] chronic neck and low back pain have significantly affected his ability to be gainfully employed.  Demands of his job as a biomedical technician have been significantly affected . . . " (Tr. 994).  The ALJ gave "great weight" to both of these opinions, thus indicating that she found there was no conflict between the opinions and her RFC finding (Tr. 30). Significantly, Dr. Rhine did not indicate in either of his opinions that the plaintiff had any specific limitations beyond those that the ALJ included in the RFC finding.  The plaintiff argues that "the ALJ fail[ed] to adequately explain in [the] RFC findings" an alleged conflict between Dr. Rhine's second opinion and the portion of the RFC assessment in which the ALJ found that the plaintiff could stand, walk, or sit about six hours in an eight hour workday (pl. brief at p. 31).  However, there is no conflict as Dr. Rhine did not address the plaintiff's

26

ability to stand, walk, or sit (Tr. 994). The state agency physicians, however, explicitly addressed this issue and opined that the plaintiff could stand, walk, or sit about six hours in an eight hour workday (Tr. 969, 1323), and the ALJ adopted these opinions verbatim in her RFC finding (Tr. 19).  Accordingly, the ALJ did not err in this regard.

The plaintiff next argues that the ALJ should have included in the RFC finding restrictions as to stress level, relations with supervisors and co-workers, and need for few changes in work environment (pl. brief at p. 33).  With regard to the plaintiff's mental impairments, the ALJ found that he was capable of performing work involving simple instructions and occasional contact with the public (Tr. 20).  The ALJ adopted Dr. Clanton's opinion that the plaintiff was limited to work involving simple instructions (Tr. 20, 32; *see* Tr. 976-78).  The ALJ also adopted Dr. Clanton's opinion that the plaintiff did not have any limitations in his ability to interact with peers, co-workers, and supervisors (Tr. 20, 32; *see* Tr. 976-78).  In addition, Dr. Clanton opined that the plaintiff would "perform best" in situations that did not require "on-going interactions with the public" (Tr. 978).  The ALJ also accounted for this opinion by limiting the plaintiff to only occasional contact with the public (Tr. 20).

Dr. Clanton is a state agency psychologist, and the ALJ was entitled to rely upon his opinion because state agency doctors are "highly qualified . . . experts in the evaluation of the medical issues in disability claims under the Social Security Act." *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); *see also id.* §§ 404.1527(c)(6), 416.927(c)(6). Further, as the ALJ correctly emphasized (Tr. 32), Dr. Clanton's opinion is consistent with the objective findings on mental status examinations (Tr. 32).  Such examinations reflected that the plaintiff was able to follow verbal and written instructions; his attention, concentration, memory and cognition were at least adequate; his intelligence was at least normal; he appeared to be capable of interacting and communicating with others; and there was no clear evidence of impaired social functioning (Tr. 19, 25, 27, 29; *see* Tr. 534-38,

542, 652-53, 665-66, 967, 1083, 1167-72).  In addition, and as the ALJ indicated (Tr. 31-32), Dr. Clanton's opinion is also consistent with the opinions provided by the other state agency psychologists who reviewed the evidence of record.  Drs. Wieland and Waller both opined that the plaintiff was able to perform simple tasks (Tr. 546, 548, 1185, 1187, 1189) and that, although the plaintiff had some limitations in his ability to interact with the general public, he was able to relate appropriately to supervisors and co-workers (Tr. 546, 547, 548, 1187, 1188, 1189).

Furthermore, Dr. Clanton's opinion is also consistent with the plaintiff's activities of daily living.  As the ALJ correctly stated, the plaintiff admitted that he was able to go to school; complete school assignments; do work study; participate in vocational rehabilitation; handle his finances; live alone; take care of himself independently, including by maintaining his personal hygiene; do household chores such as cleaning, cooking, and laundry; use public transportation; shop for and unload groceries; use a computer; and interact with others at school, on the telephone, and online (Tr. 18, 19, 23, 25, 27, 30; *see* Tr. 337, 339, 340, 341, 537, 773-77, 864, 866, 867, 951, 1169, 1427).  The plaintiff further admitted that he was able to drive, study the Bible, and watch television (Tr. 61, 341, 1169). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (upholding finding that claimant's routine activities – including visiting relatives, reading, watching television, cooking, cleaning the house, managing household finances, and washing clothes – were inconsistent with complainant's alleged inability to work).

The plaintiff asserts that "[t]here is no indication that [he] actually completed any coursework" (pl. brief at p. 35).  However, the plaintiff specifically admitted that "when level of pain allows," he "complete[s] school assignments" (Tr. 337).  In addition, although the plaintiff asserts that he "frequently stopped going to school" (pl. brief at p. 35), he admitted that he completed a degree in criminal justice and nearly completed a degree in medical equipment repair (Tr. 61, 1169).

The plaintiff argues that the ALJ "should have considered . . . Dr. Fogle's opinion that [he] had moderate limitations in responding to increasing work pressures and moderate limitations in ability to adjust to changes in the work environment" (pl. brief at p. 36 (citing Tr. 1167-71)).  The ALJ cited Dr. Fogle's findings and gave his opinion "some weight" (Tr. 32 ("Vernell K. Fogle, Ph.D., opined that [the plaintiff] . . . had moderate limitations in responding to increasing work pressures; and [that] he had moderate limitation in ability to adjust to changes in the work environment").  Significantly, Dr. Fogle did not opine that these moderate limitations gave rise to any restrictions beyond those that the ALJ included in the RFC finding.  Further, Dr. Waller, a state agency psychologist whose opinion was given "significant weight" by the ALJ (Tr. 32), specifically relied upon Dr. Fogle's report as the principal evidence supporting his opinion that the plaintiff did not have any mental limitations beyond what the ALJ included in his RFC finding (Tr. 1185).

The plaintiff also argues that the ALJ improperly discounted his credibility "'solely because [his statements] are not substantiated by the objective medical evidence'" (pl. brief at p. 34).  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause

the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

> (1)    the individual's daily activities;
>
> (2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> (3)    factors that precipitate and aggravate the symptoms;
>
> (4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> (5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> (6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> (7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

31

The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment (Tr. 20-21).  As argued by the Commissioner, the ALJ supportably discounted the plaintiff's credibility for several reasons: (a)  he made the "patently untrue statement" that he did not have a history of substance abuse (Tr. 26; *see* Tr. 62, 450, 541, 612, 621, 692, 706, 861, 958, 965, 967, 1340); (b)  Dr. Irizarry reported that the plaintiff's examination and stated symptomatology "do not correlate" (Tr. 22 (*see* Tr. 772); (c)  his medical providers believed that he was malingering (Tr. 19, 27, 29, 33 (*see* Tr. 635, 808, 1365, 1418, 1424, 1441)); (d)  the findings on mental status examination were benign (Tr. 33); (e)   the plaintiff was noted to try to direct physicians to diagnoses or medications (Tr. 33); (f)  he was independent in his activities of daily living (Tr. 33); and (g)   the plaintiff "generally does not show up for psychiatric treatment, and there were long gaps in treatment" (Tr. 33).  The ALJ clearly did not rely solely on a lack of objective evidence in assessing the plaintiff's credibility.  Based upon the foregoing, the undersigned finds that the ALJ properly considered and supported the credibility finding.   Moreover, substantial evidence supports the ALJ's RFC finding concerning the plaintiff's mental limitations.  *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir.1984) (an ALJ is accorded deference as to determinations of a claimant's credibility).

## CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 15, 2014
Greenville, South Carolina